**Elfrin SMITH, Plaintiff,**

v.

**CPC FOODSERVICE, Defendant.**

No. 96 C 7394.

United States District Court,
N.D. Illinois,
Eastern Division.

March 5, 1997.

David L. Lee, Chicago, IL, for Plaintiff.

Marc R. Jacobs, Jeffrey H. Bergman, and Jacqueline E. Kalk, D'Ancona & Pflaum, Chicago, IL, for Defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Elfrin Smith ("Smith") has sued his ex-employer CPC International Inc. ("CPC," mistakenly named as "CPC Foodservice" in Smith's Complaint), complaining that CPC's firing of Smith was both (1) a violation of the Family Medical Leave Act of 1993 ("Act," which vests federal jurisdiction over such claims under 29 U.S.C. § 2617(a)(2)[1] and 28 U.S.C. § 1331) and (2) a retaliatory discharge in violation of Illinois public policy (a claim asserted under the supplemental jurisdiction provisions of 28 U.S.C. § 1367(a)). At the February 7, 1997 status hearing, the first one held after CPC had filed its Answer and Affirmative Defenses ("ADs") to Smith's

---

1. Further citations to the Act will take the form "Act § —," referring to the numbering within Title 29 rather than to the Act's internal numbering.

claim advanced under the Act,[2] this Court directed counsel for both parties to file memoranda addressing the potentially dispositive issues posed by ADs 1 and 2. They have done so in timely fashion, and this memorandum opinion and order addresses the matter.

CPC points to the mandatory grievance-and-arbitration provisions contained in the collective bargaining agreement ("CBA") between CPC and the union ("Union") that represented Smith and all other production employees at the facility where he worked. That CBA contained an express agreement to arbitrate all unresolved disputes involving (among other things) the application of any of the CBA's provisions, and in that respect it included (as part of its Article VI's detailed provisions regarding leaves of absence) an express provision that mandated CPC's conformity to the Act's requirements:

> SECTION 6.7 Family Leave of Absence
> Leaves of absence relating to the Family Leave Act of 1993 will be granted in accordance with the law.

In addition the CBA included a prohibition against discrimination on various specified grounds that tracked federal anti-dissemination laws (CBA § 1.7), and it also prohibited any covered employee's termination "without just cause" (CBA § 2.2, and see CBA § 4.5(b)).

As CPC would have it, those provisions mandate that Smith must have resorted to the CBA's detailed grievance and arbitration procedure rather than bringing his claim to this federal court. In fact Smith did file a grievance about March 24, 1995 (the day after his employment was terminated), asserting that his termination was not for "good cause." That filing led to an April 5 meeting among Smith, CPC representatives and Union representatives (as called for by the CBA's grievance procedure) during which meeting Smith was asked to provide documentation (as required by the Act) regarding his asserted failure to return from his family and medical leave on a timely basis. Nonetheless Smith never provided the requested documents, nor did he pursue the remaining stages of the CBA's grievance-and-arbitration process—he did not assist the Union in prosecuting his grievance or take any other actions to exhaust his remedies under the CBA.

This situation poses another instance of the tension that exists between *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which held that an arbitrator's decision under a CBA is neither preemptive nor conclusive when an employee later seeks to sue his or her employer claiming discrimination under Title VII, and the considerably more recent decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), which has held that statutorily-based claims are just as subject to enforceable agreements to arbitrate as non-statutory claims. CPC's Mem. 7 urges that *Gilmer* "effectively overruled *Gardener–Denver* [sic] when it unequivocally stated that statutory claims may be subject to arbitration unless Congress demonstrated a clear intent that the statutory right at issue was not waivable." Smith's position is the polar opposite—his Mem. 5–8 asserts that *Gardner–Denver* is still alive and well and living in Washington (and hence a fortiori in Chicago) and that it "applies to the Family and Medical Leave Act right down the line" (*id.* at 6).

This Court need not subscribe to the extreme position advanced by either litigant—either the death of *Gardner–Denver* or its unimpaired vitality in all respects. Instead the parties' positions will be examined in light of the manner in which *Gilmer* itself distinguished *Gardner–Denver* and the succeeding cases that had followed it (500 U.S. at 35, 111 S.Ct. at 1656–57 (citation omitted)):

> There are several important distinctions between the *Gardner–Denver* line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed

---

**2.** At the initial status hearing on December 27, 1996 this Court had orally dismissed Complaint Count II as having failed to state a claim that could entitle Smith to relief.

to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements." Therefore those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim.

■■■ Here by contrast "the issue of the enforceability of an agreement to arbitrate statutory claims" is presented directly: CPC's CBA § 6.7 sets out CPC's express promise to comply with the Act, and the CBA's arbitration agreement is all-encompassing, extending to "any dispute or difference of opinion ... between the Company and any of its employees covered by this Agreement, involving the meaning, interpretation or application of the provisions of this Agreement" (CBA § 3.1).[3] And that in turn means that, with employees' rights under the Act coming directly within the scope of the expansive grievance and arbitration provisions, unlike Gardner–Denver an arbitrator in Smith's case would have been "authorized to resolve such [a] claim[ ]" that CPC had breached the CBA by its noncompliance with the Act.[4] As for the issue of representation by Smith's Union, in this instance there is no basis whatever for suggesting the existence of any "tension between collective representation and individual statutory rights"—instead the Union representatives had specifically taken up the cudgels for Smith, and it was his own actions that prevented the Union from pursuing his rights. Finally, the "lib-

eral federal policy favoring arbitration agreements" applies not only to the Federal Arbitration Act but to labor-based disputes as well (a principle established by the famous Steel workers Trilogy over three decades ago and consistently reiterated since then).

There is more as well. Gilmer, 500 U.S. at 26, 111 S.Ct. at 1652 reiterated the proposition announced in Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 3354–55, 87 L.Ed.2d 444 (1985) that "[h]aving made the bargain to arbitrate, the parties should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." And in that respect Gilmer, id. has placed the burden on the party seeking to avoid arbitration to demonstrate that congressional intention. In this instance the Act clearly reflects no such preclusive intention, and is indeed entirely consistent with a resort to arbitration rather than treating such resort as overridden by pursuing a lawsuit under Section 2617:

1. It should be mentioned first of all that the Act was adopted in 1993, at a time when Gilmer and the principles that it announced were already in place. Thus Congress must be presumed to have been well aware of the Gilmer-dictated need to evince its intention to preclude parties from waiving a judicial forum for their claims under the Act if Congress really wanted to do that. And the Act is wholly devoid of any such provision.

2. Both the findings and the purposes of the Act as expressed in Act § 2601 reflect an obvious awareness of the fact that the rights conferred by the Act establish employment policies of the same type that are typically embraced in CBAs. Indeed, the effective-date adjunct to the Act (Section 405 of Pub.L. 103–3) had a special provision as to the Act's date of effectiveness with respect to collective bargaining agreements that had been in place before

---

3. CBA § 3.1 establishes the procedure for resolving all employee grievances, Step 4 of which is the all-inclusive provision for arbitration of "[g]rievances that are not satisfactorily settled in accordance with the foregoing procedure."

4. Indeed, Smith himself really recognized that breadth of scope of the grievance provision (the precursor to arbitration) when he initially took his dispute to grievance under the CBA.

the more generally prescribed effective date of the Act—a provision that plainly recognizes the inter-relationship between the rights provided by the Act and the rights typically provided by CBAs.

3. Act § 2612's leave requirements are by their terms directly tied to leave provisions that have otherwise been established by employers—again a subject that is typically covered by CBAs for bargaining unit employees, and that is expressly covered in this instance by CPC's Article VI (the Article that contains CBA § 6.7, which as said earlier specifically requires CPC to comply with the Act).

4. Additionally, Act § 2614 provides protection of employment and employment benefits provided by employers, and of course those benefits are invariably the direct subject of every CBA.

In sum, CPC clearly has the better of the argument in a situation where (as here) a CBA has expressly addressed employees' rights under the Act in a way that brings the employee's claim well within the scope of the CBA's arbitration procedure. This Court recognizes that it writes on an essentially clean slate in that respect,[5] for except as referred to in n. 5 the only two reported decisions that have considered the relationship between a lawsuit under the Act and a preexisting arbitration agreement (*Satarino v. A.G. Edwards & Sons, Inc.*, 941 F.Supp. 609, 613 (N.D.Tex.1996) and *Hoffman v. Aaron Kamhi, Inc.*, 927 F.Supp. 640, 642–43 (S.D.N.Y.1996)[6]) have dealt with employees covered by individual employment agreements rather than by a CBA. It is worth observing, though, that each of those two

cases reached a conclusion that a sufficiently broad arbitration agreement would have to be honored and complied with, rather than the employee's being entitled to ignore the agreement by bringing suit under the Act instead.

In any event, this Court concludes that the contentions advanced by CPC in ADs 2 and 3 are sound and require the dismissal of this action. It is indeed dismissed.

---

5. "Essentially" is used here advisedly. *McGinnis v. Wonder Chem. Co.*, No. CIV. A. 95–4384, 1995 WL 756590 (E.D.Pa.1995) has considered the same question in the context of claims under both the Act and the Americans With Disabilities Act, in a situation in which the union had referred the employee directly to the EEOC rather than pursuing the grievance-and-arbitration route specified by the CBA. Although the employer had abandoned its original assertion of arbitration as a required path for the employee to travel, the court commented in dictum (*id.* at *2 n. 1) that *Gardner–Denver* rather than *Gilmer* would apply to the situation before it, on the theory that a bright line separated the coverage of those cases: whereas *Gilmer* dealt only with *individual* employment contract situations (thus

involving the Federal Arbitration Act), *Gardner–Denver* covered the *CBA* situation (which does not look to the Federal Arbitration Act as the source of the duty to arbitrate). With all respect, that court's brief statement of such a rule—without any analysis of the Act in light of the *Gilmer* criteria as explained here—is simply not persuasive.

6. Unlike the situation here, *Hoffman* denied a motion to dismiss based on the employee's failure to arbitrate—but it did so because of the dramatically different nature of the arbitration provision, which was not as Act-specific and as broadly framed as the CBA here.